```
 1

 2                 UNITED STATES DISTRICT COURT

 3                 SOUTHERN DISTRICT OF NEW YORK

 4    PAUL KUHNE,                     )

 5             Plaintiff,          )

 6             vs.                  ) No. 07-CV-1364

 7    COHEN & SLAMOWITZ, LLP., and)     (HB)(RLE)

 8    MIDLAND FUNDING NCC-2 CORP.,)

 9             Defendants.        )

10    ---------------------------)

11

12            DEPOSITION OF DAVID A. COHEN, ESQ.

13                 New York, New York

14              Monday, November 26, 2007

15

16

17

18

19

20

21

22    Reported by:

23    ANGELA BITJONIDES

24    JOB NO.  199069

25
```

1                   Cohen

2       A.    No, I don't.  That was Friday and this is

3   Monday.  I don't recall.

4       Q.    Is there anything that would refresh your

5   recollection?

6       A.    This deposition I'm sure will do that for

7   me.

8       Q.    What is your position at Cohen &

9   Slamowitz, LLP.?

10      A.    I'm a partner at the law firm.

11      Q.    Managing partner?

12      A.    No, I'm not.

13      Q.    Do you have a job title?

14      A.    Senior partner.

15      Q.    Now, Cohen & Slamowitz is the successor

16  firm to Upton, Cohen & Slamowitz; is that correct?

17      A.    Yes.

18      Q.    When did Mr. Upton retire?

19      A.    1995 or 1996.

20      Q.    When did his name come off the masthead?

21      A.    I think it was 2003 or 2004.

22      Q.    What is the location of your office?

23      A.    199 Crossways Parkway Drive in Woodbury,

24  New York.

25      Q.    What is your home address?

```
 1                    Cohen

 2      A.    Do I have to give that?

 3      Q.    If I need to Subpoena you, I need the

 4   address.

 5      A.    Then, Subpoena me in care of my attorney.

 6   I give you that privilege.  He will accept service.

 7            MR. LEGHORN:  I will accept service for

 8      you.

 9      Q.    Are there any other offices for Cohen &

10   Slamowitz?

11      A.    No.

12      Q.    Now, do you know the plaintiff, Paul

13   Kuhne in any way?

14      A.    No.

15      Q.    Did you play any role in the collection

16   of his account?

17      A.    Yes.

18      Q.    What was your role?

19      A.    I set up the account when it was placed

20   with us by our client.

21      Q.    What do you mean "I set up the account"?

22      A.    The account.  I met with the client

23   initially to go over the type of placement that

24   would be given to our office.  This would be

25   delinquent credit card debt.  I review the nature of
```

1                        Cohen

2    the data that we would be required to receive in

3    order to accept the claim.  We identified the

4    specific fields that would be formatted to us in the

5    electronic placement of the account.  I instructed

6    my IT staff how to request this information and what

7    to do with the information when it came into my

8    office.

9              I drafted the form of the letter that

10   went out to Mr. Kuhne.  I reviewed the FDPCA to

11   determine what sections of it were necessary to be

12   put into the Demand Letter and Debt Valuation

13   Notice.  I reviewed the form and substance of the

14   Card Members Agreement and determine the Causes of

15   Action to include in our Summons and Complaint.

16             I determined whether there was a claim

17   that should be brought in by arbitration forum or if

18   it was okay to sue him in New York Court.  I

19   determined the venue to be chosen.  I determined the

20   Causes of Action to be included in the Summons and

21   Complaint.  I may have done some other things but I

22   don't recall specifically what they were.

23        Q.    When you saw you met with the client,

24   who was the client that you met with?

25        A.    I met with Midland Credit Management.

```
 1                      Cohen
 2        Q.    Who at Midland Credit Management did you
 3   meet with?
 4        A.    I meet with many people.  I don't recall
 5   the order I've met them.  Some of the people I have
 6   met since have left.  I've met other people who have
 7   taken their place.  We're doing work for this client
 8   for many years.
 9        Q.    Many years?  About how many years?
10        A.    More than ten.
11        Q.    Where did this meeting take place?
12        A.    Some in San Diego.  Some in New York
13   State and some at conferences we've had with the
14   clients around the country.  Some sometime with the
15   NARCA Association -- that's National Association of
16   Retail Collection Attorneys.  Typically, our clients
17   hold a conference with its attorneys as a part of
18   this NARCA convention twice a year.
19        Q.    How long have you been a NARCA member?
20        A.    Also at least ten years.
21        Q.    Did you ever have any meetings with
22   anyone from Midland Funding NCC-2 Corp?
23        A.    No.
24        Q.    So all your dealings have been with
25   people who work for Midland Credit Management?
```

```
 1                    Cohen
 2      Q.    With respect to all the matters that are
 3 referred to Cohen & Slamowitz, were the accounts
 4 owned by Midland Funding NCC-2 Corp., or MRC
 5 Receivables, does the name Midland Credit Management
 6 go down on the contact people for the file?
 7      A.    Yes.
 8      Q.    Here you've got Midland Credit versus
 9 Kuhne, Paul.  You see where it's says that's the
10 creditor and debtor?
11      A.    Yes.
12      Q.    Midland Credit is listed as the creditor
13 here, right?
14      A.    It is the creditor.  It's the client,
15 yes.
16      Q.    Taking a look here on the April 24th,
17 2006 entry --
18      A.    Yes.
19      Q.    -- was that when the file was opened in
20 your computer system?
21      A.    I believe so.
22      Q.    EDI, what does that stand for?
23      A.    Electronic Data Interface.
24      Q.    When an account is opened like the Kuhne
25 account here, what kind of materials are printed?
```

```
 1                    Cohen
 2      A.    Electronic information which sets forth
 3  all the necessary information for us to determine
 4  there was a contract; that there was a breach of the
 5  contract and there were damage resulting from the
 6  breach.
 7      Q.    Do you know what information is contained
 8  in these blacked out portions there?
 9      A.    No, I don't.
10      Q.    Did you black them out?
11      A.    Somebody in my office may have or counsel
12  may have.
13      Q.    Counsel meaning Mr. Leghorn?
14      A.    Yes.
15      Q.    Electronic data interface or interchange?
16      A.    Interface.
17      Q.    Is there any human involvement when stuff
18  is transferred over by electronic data interface?
19      A.    Their staff puts files into certain
20  format.  All the data files that we require, they
21  transfer it over.  My staff interpreted the
22  electronic data and drops it into various fields and
23  reformats it in our office.  Their IT staff and
24  their personnel who check their data and their
25  personnel who oversees the day-to-day function all
```

```
 1                    Cohen
 2  handled at that end and my receptacle people handle
 3  it in my office.
 4       Q.    Is there any telephone interaction for
 5  that?
 6       A.    Not in the particular placement of a
 7  claim.
 8       Q.    In the case of Mr. Kuhne, do you know
 9  what kind of information would have been
10  transferred?
11       A.    Again, information sufficient for us to
12  determine.  We would ask for all the necessary
13  information so we could open an account up, frame a
14  cause of action.  There are certain fields of
15  information we require before we go forward.
16       Q.    Is there any reason to believe any kind
17  of privileged information was transferred on April
18  24, 2006 or April 25th?
19       A.    If it's has been blacked out I assume we
20  feel there might be something there that is
21  privileged.
22       Q.    By you or Mr. Leghorn?
23       A.    Either of us.
24       Q.    Did you have any conversation with
25  Mr. Leghorn to determine whether or not this matter
```

```
 1                         Cohen

 2    should be designated privileged?

 3         A.    We had a brief discussion at the time we

 4    printed it and sent it over to counsel to review.

 5    And, I believe, counsel gave me some advice.

 6    Perhaps, you would like to ask him what advice that

 7    was.

 8              MR. LEGHORN:  You indicated we had the

 9         discussion which is not privileged but

10         substance is.

11              Continue.

12         Q.    I'm not asking for substance?

13         A.    Okay.

14         Q.    Looking at the first entry there SNCOK,

15    do you see where it says that at 12:06 on 4/25/06?

16         A.    Yes.

17         Q.    What does that SNCOK stand for?

18         A.    I have no idea.

19         Q.    What does new claim fixed?

20         A.    They cleaned up data and put everything

21    into proper fields.  Nothing broken they had to fix.

22    Fixed is just some term they used.

23         Q.    Would that have something to do with

24    filling in entries?  Replace creditor's name

25    Associates?
```

```
 1                    Cohen
 2      A.    It's the original named creditor.  The
 3   name would have been Associates.  It's not the
 4   creditor's name.
 5      Q.    What's a CBR?  It's says "Request for a
 6   CBR for the number one?
 7      A.    Yes, it's a code indicating we requested
 8   a CBR.
 9      Q.    What's a CBR?
10      A.    Credit Bureau Report.
11      Q.    Meaning, you pulled the credit report?
12      A.    Yes.
13      Q.    What is the purpose of pulling the credit
14   report?
15      A.    Well, several purposes.  We wanted to
16   make sure our address information is accurate.  Two,
17   to check the data we have been given by the client.
18   To see that the Social Security matches.  The home
19   address, Social Security.  To see everything.  To
20   see the debtor's name is correct.  To see if there
21   are any aka's reported.  We also like to get a sense
22   of who our debtor is.  We like to see if our
23   client -- the claim that was referred to us was
24   actually annotated on the face of the Credit
25   Bureau's Report and in this instance it was.
```

1                      Cohen

2      Q.     How do you know this?

3      A.     I saw it.  I reviewed it.

4      Q.     Which claims are we talking about?

5  Midland Credit's claims?

6      A.     I'm talking about the claim for the

7  plaintiff against this defendant, yes.

8      Q.     That Midland Credit had reported

9  Mr. Kuhne is owing money?

10     A.     There was an entry on the face of the

11 document indicating Midland purchased an account or

12 Midland's entity purchased an account from

13 previously owned by the Associates, Citibank and

14 reported the balance at the time of transfer and

15 also reporting current balance.

16     Q.     Now, did you personally look back then or

17 now?

18     A.     I don't recall which but I looked at it

19 recently again.  I've looked at this Credit Bureau

20 Report.

21     Q.     Is there any indication her on CNS 12

22 through 22 that you played any role in the actual

23 completion of Mr. Kuhne's account?

24     A.     I don't know if my initial appearance

25 here were.  If I did something affirmative on the

```
 1                      Cohen
 2   account or directed someone to do something, my
 3   codes would be in there.  Typically, it's not
 4   reflected -- the work of the attorneys -- in the
 5   notes.
 6        Q.    Did you play in the role of the
 7   collection of Mr. Kuhne?
 8        A.    I think I answered that.  That was the
 9   first question today.
10              Want to read it back?
11        Q.    Yes or no.
12        A.    Asked and answered.  Read it back.
13        Q.    That's not a proper objection.  Did you
14   play any role in the collection of Mr. Kuhne's
15   account?
16        A.    That was a question that you asked
17   earlier.
18              MR. LEGHORN:  Answer yes or no.
19              THE WITNESS:  Yes.
20              MR. LEGHORN:  He went through it in
21        depth.
22              MR. BROMBERG:  We talked in general about
23        Midland.  I want to know what role he played?
24        Q.    What was your involvement in the
25   collection of Mr. Kuhne's account, to the best of
```

1                        Cohen

2    your recollection?

3              MR. LEGHORN:  Give a quick summary.

4         A.    I don't recall what I said.  I would like

5    you to read it back to see if you like the answer.

6    To see if you want me to embellish.

7         Q.    Let's move on.  With respect to this

8    exhibit where you've got audit added query 5502,

9    what is that?

10        A.    I don't know.

11        Q.    Collection managers 0,89 changed to 8989?

12        A.    I don't know.

13        Q.    The next line where it's been blacked

14   out, do you know what kind of matter that was

15   regarding?

16        A.    No.

17        Q.    Have you seen the unredacted version of

18   this?

19        A.    I don't recall.

20        Q.    Now, review file prior to suit.  Do you

21   see that at the bottom for 4/28/06?

22        A.    Yes.

23        Q.    What's ED2?

24        A.    I don't know.

25        Q.    Now, 4/28 -- following page -- first Dunn

```
 1                    Cohen
 2   Notice.  Do you see that?
 3       A.    Yes.
 4       Q.    That would be the first collection letter
 5   that went out correct?
 6       A.    Yes.
 7             MR. BROMBERG:  I ask this be marked as
 8        Plaintiff's 6.
 9             (Plaintiff's Exhibit 6, Dunn Letter dated
10        4/28/06, marked for identification, as of this
11        date.)
12       Q.    I show you what was marked as Plaintiff's
13   Exhibit 6 and I'm showing you a copy to your counsel
14   as well.  On the bottom it's says C&S1 at the
15   bottom.  Have you seen this document before?
16       A.    Yes, I have.
17       Q.    Is this the first Dunn Notice referred to
18   on C&S13 and Plaintiff's Exhibit 5?
19       A.    It appears to be.
20       Q.    The information filled in here for
21   original creditor and creditor's account number and
22   C&S file number and balance, do you see all that?
23       A.    Yes.
24       Q.    If you turn to the first page of
25   Plaintiff's 5 where it says C&S12 on the lower
```

```
 1                    Cohen
 2  right?
 3       A.    Yes.
 4       Q.    All that information that appears there
 5  the original creditor, creditor's account number,
 6  C&S file number and balance due --
 7       A.    Yes.
 8       Q.    -- would that be information
 9  electronically transmitted on 4/24/06?
10       A.    It would have been a part of it.
11       Q.    What other parts would there have been?
12       A.    There would have been date of opening of
13  the account, date of charge off of the account,
14  Social Security number provided to us.
15             There would have been perhaps a reference
16  of the portfolio so we know which Credit Card
17  Agreement would be governing it.  I'm sure there was
18  other information I'm not thinking of at the moment
19  but that's the bare minimum.
20       Q.    Date of opening of the account, is there
21  something privileged of that?
22       A.    No.
23       Q.    Date of charge off of the account, is
24  that somehow secret?
25       A.    What's your question?
```

1                        Cohen

2        Q.    Is there something secret about it?  Some

3   reason why it was blacked out?

4        A.    I didn't say it was blacked out.

5        Q.    Where is it on Plaintiff's 5 on the first

6   page?

7        A.    I don't know.

8        Q.    Now, everything that appears on

9   Plaintiff's 6 come from Plaintiff's 5; correct?

10       A.    I said I don't know.  Plaintiff's 5?

11  Plaintiff's 6?  I'm not following you.  The file

12  transmitted to us in a certain format.  We pull

13  certain fields of data -- electronic bits of data --

14  and use that information to re-format it and print

15  the letter.  What's here are paperless.  What's here

16  are excerpts of electronic bits of data.  What's

17  here is not necessarily here and what's her is not

18  necessarily there.

19            MR. BROMBERG:  Maybe we can save

20        ourselves a lot of time here.  Is there any

21        reason why you're not turning over the first

22        page of Plaintiff's 5 with those sections

23        unredacted?

24            MR. LEGHORN:  Yes because in consultation

25        with my client it was determined that -- we're

```
 1                       Cohen
 2          talking about the first page only?
 3          MR. BROMBERG:  Yes.
 4          MR. LEGHORN:  First page was with respect
 5      to information that was forwarded to them and
 6      was information coming from them that he
 7      wished to assert the attorney/client privilege
 8      as to attorney/client communications as to the
 9      handling of this matter.
10          That's the basic problem.  I advised you
11      this morning there is nothing in that
12      information that even addresses whether Midland
13      Funding was licensed by the DCA.  There is no
14      discussion.  There is nothing in there as to
15      DCA's licensing at all.
16          THE WITNESS:  If I may, at the time this
17      account was placed licensing was not an issue.
18      We wouldn't have cared if a client was licensed
19      or not.
20          MR. LEGHORN:  There was no question.
21          Q.    Were there any instructions as to the
22      handling of the account in 4/24/06 and the entries
23      for 4/24/06, 4/22/06, 4/25/06 -- first page of
24      Plaintiff's 5?
25          A.    I don't know.
```