UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
————————————————————————

MICHAEL HALLMARK, on behalf of
himself and all others similarly situated,

       Plaintiff,

  vs.

COHEN & SLAMOWITZ, LLP
MIDLAND FUNDING LLC d/b/a
MIDLAND FUNDING OF DELAWARE LLC,

      Defendants.

————————————————————————

No. 11-CV-842(EAW)(LGF)

CLASS ACTION

**Plaintiff's Memorandum in Support of the**
**Plaintiff's Motion for Final Approval of**
**Class Action Settlement, Attorney Fees, and Representative Fees**

Respectfully Submitted,

PLAINTIFF MICHAEL HALLMARK,
individually and on behalf of the Class.

Jonathan R. Miller
Law Office of Jonathan R. Miller,
PLLC
d/b/a Salem Community Law Office
301 N. Main St., 24th Floor
Winston-Salem, NC 27101
Tel: (336) 837-4437
Fax: (336) 837-4436
jmiller@salemcommunitylaw.com

Brian L. Bromberg
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
Tel: (212) 248-7906
Fax: (212) 248-7908
brian@bromberglawoffice.com

Kenneth R. Hiller
Seth J. Andrews
Law Offices of Kenneth Hiller, PLLC
6000 N. Bailey Ave., Suite 1A
Buffalo, NY 14226
Tel: (716) 564-3288
Fax: (716) 332-1884
khiller@kennethhiller.com
sandrews@kennethhiller.com

# Table of Contents

Table of Authorities..................................................................................................................ii

Introduction and Class Member Response to the Notice of Settlement........................................1

Background and Summary of Settlement......................................................................................2

Argument ......................................................................................................................................3

   I.    Class Notice and the Response of the Class ..........................................................................3

      A.   Notice was reasonable and the best practicable ...........................................................3

      B.   The response of the Class and how the parties propose to handle ambiguous claim forms ..4

   II.   Factors Bearing on Final Approval ......................................................................................4

      A.   The complexity, expense and likely duration of the litigation ...................................5

      B.   Reaction of the Class to the settlement ......................................................................5

      C.   The stage of the proceedings and the amount of discovery completed .......................6

      D.   The risk of establishing liability and damages ...........................................................6

      E.   The risks of maintaining the class action through the trial ..........................................7

      F.   The ability of Defendants to withstand a greater judgment...........................................7

      G.   The range of reasonableness of the settlement in light of the best possible recovery in light of all the attendant risks; opinions of class counsel ...........................................................8

   III.  Award to representative Plaintiff ..........................................................................................9

   IV.  *Cy Pres* Award ...................................................................................................................9

   V.   The attorney fees and costs sought by Plaintiff on behalf of the class are fair and reasonable .....................................................................................................................................9

      A.   The proposed fee is reasonable .................................................................................11

      B.   Plaintiff's attorneys' hourly rates are reasonable .....................................................16

      C.   An upward adjustment should be made ......................................................................18

      D.   Award to representative Plaintiffs ..............................................................................28

   VI.  Plaintiff is entitled to recover the costs of having to retain an expert consulting accountant to sift through the tens of thousands of pages of financial records C&S eventually produced ..........28

Conclusion....................................................................................................................................30

## Table of Authorities

**Page(s)**

**Cases**

*Acevedo v. Workfit Medical LLC,*
187 F. Supp. 3d 370 (W.D.N.Y. 2016) (Wolford, J.) ............................................19

*Algie v. RCA Global Commc'ns, Inc.,*
891 F. Supp. 875 (S.D.N.Y. 1994) ....................................................................14

*Amchem Products, Inc. v. Windsor, Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997).........................................................................................10

*Aramburu v. Healthcare Financial Services, Inc.,*
No. 02-CV-6535, 2009 WL 1086938 (E.D.N.Y. April 12, 2009)............................6

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,*
522 F.3d 182 (2d Cir. 2008)...............................................................11, 12, 16, 17

*Bailey v. District of Columbia,*
839 F. Supp. 888 (D.D.C. 1993) ...................................................................14, 21

*Bankston v. State of Illinois,*
60 F.3d 1249 (7th Cir. 1995) ...........................................................................14

*In re Beverly Hills Fire Litig.,*
639 F.Supp. 915 (E.D.Ky, 1986) ......................................................................19

*Blanchard v. Bergeron,*
489 U.S. 87 (1989)...........................................................................................13

*Blum v. Stenson,*
465 U.S. 886 (1984)...........................................................................13, 15, 24

*Brinker v. Giuffrida,*
798 F.2d 661 (3d Cir. 1986).............................................................................18

*In re Cenco Inc. Sec. Litig.,*
519 F.Supp. 322 (N.D.Ill. 1981) .......................................................................19

*In re Cendent Corp. PRIDES Litig.,*
243 F.3d 722 (3d Cir. 2001).............................................................................18

*Chambless v. Masters Mate & Masters Pension Plan*,
  885 F.2d 1053 (2d Cir. 1989) .......................................................................14, 15

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ..............................................................................4, 5

*Cohen v. West Haven Bd. Of Police Com'rs*,
  638 F.2d 496 (2d Cir. 1980) ...............................................................................13

*Cunningham v. Suds Pizza, Inc.*,
  290 F. Supp. 3d 214 (W.D.N.Y. 2017) ...............................................................19

*Daly v. Hill*,
  790 F.2d 1071 (4th Cir. 1986) .............................................................................13

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. Oct. 11, 2011) (Larimer, J.) .............................19

*De Jesus v. Banco Popular de Puerto Rico*,
  918 F.2d 232 (1st Cir. 1990) ...............................................................................11

*DiFilippo v. Morizio*,
  759 F.2d 231 (2d Cir. 1985) ..........................................................................13, 16

*In re Eastman Kodak ERISA Litig.*,
  213 F. Supp. 3d 503 (W.D.N.Y. 2016) (Larimer, J.) ..........................................19

*Emanuel v. American Credit Exchange*,
  870 F.2d 805 (2d Cir. 1989) ...............................................................................11

*Farbotko v. Clinton County of New York*,
  433 F.3d 204 (2d Cir. 2005) ...............................................................................16

*Gary v. Kason Credit Corp.*,
  No. 95-CV-54 (D. Conn. Oct. 21, 1998) ............................................................14

*Gates v. Deukmejian*,
  987 F.2d 1392 (9th Cir. 1992) .............................................................................18

*Godson v. Eltman, Eltman & Cooper, P.C.*,
  No. 11-CV-764-EAW, ___ F.R.D. ___, 2018 WL 5263071 (W.D.N.Y. Oct.
  23, 2018) ...................................................................................................... *passim*

*Graziano v. Harrison*,
  950 F.2d 107 (3d Cir. 1991) ...............................................................................11

iii

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..........................................................................................13

*Johnson v. Georgia Highway Exp., Inc.*,
    488 F.2d 714 (5th Cir. 1974), *overruled on other grounds by Blanchard v.*
    *Bergeron*, 489 U.S. 87 (1989).................................................................... *passim*

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998)..............................................................................29

*Lemire v. Wolpoff & Abramson, P.C.*,
    D. Conn., Docket No. 08-cv-249(CSH) ............................................................24

*In re: Marine Midland Motor Vehicle Leasing Litigation*,
    155 F.R.D. 416 (W.D.N.Y. 1994)......................................................................28

*McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*,
    450 F.3d 91 (2d Cir. 2006)................................................................................15

*Miele v. New York State Teamsters Conference Pension & Retirement Fund*,
    831 F.2d 407 (2d Cir. 1987)..............................................................................14

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)..........................................................................................13

*Morgan v. Credit Adjustment Board*,
    1998 U.S. Dist. Lexis 8135 ...............................................................................21

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
    No. 05-11148, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) ..............................19

*Odom v. Hazen Transport, Inc.*,
    275 F.R.D. 400 (W.D.N.Y: 2011) (Payson, J.)..................................................19

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985).......................................................................................3, 4

*Pipiles v. Credit Bureau of Lockport*,
    886 F.2d 22 (2d Cir. 1989). Civil.......................................................................11

*In re: Rite Aid Securities Litigation*,
    269 F.Supp. 2d 602 (E.D. Pa. 2003) ...................................................................6

*Tolentino v. Friedman*,
    46 F.3d 645 (7th Cir. 1995) .........................................................................11, 27

*Trimpter v. City of Norfolk*,
    846 F. Supp. 1295 (E.D. Va. 1994) ......................................................................13

*Underdog Trucking, L.L.C. v. Verizon Serv. Corp.*,
    276 F.R.D. 105 (S.D.N.Y.2011) ..........................................................................16

*United States Football League v. National Football League*,
    887 F.2d 408 (2d Cir. 1989)..........................................................................16, 18

*Venes v. Professional Service Bureau, Inc.*,
    353 N.W.2d 671 (Minn. App. 1984)......................................................................11

*Vizcaino v. Microsoft*,
    290 F.3d 1043 (9th Cir. 2002) ............................................................................18

*Withers v. Eveland*,
    997 F. Supp. 738 (E.D.Va. 1998) ....................................................................20, 21

*Zagorski v. Midwest Billing Services, Inc.*,
    128 F.3d 1164 (7th Cir. 1997) ......................................................................11, 27

**Statutes**

Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ............................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 23 ....................................................................................................1, 20

Laura B. Bartell, *Taxation of Costs and Awards of Expenses in Federal Court* ..........................16

**Introduction and Class Member Response to the Notice of Settlement**

Plaintiff Michael Hallmark and Class Counsel did an extraordinary job here. After seven years of written discovery practice, motion practice—including a successful class-certification motion—resulting in 13 decisions published in the Federal Rules Digest and on Westlaw and LEXIS, expert review of Defendants' financial records, and a lengthy settlement conference before Hugh Russ, Esq., the parties settled. Due to Mr. Hallmark's diligence, approximately 2,734 class members who sent in claim forms are going to receive approximately $59.45 each, if this settlement is approved. (This is calculated by taking the $225,000 total cash sum from Defendants, subtracting $25,000 to Mr. Hallmark, minus approximately $37,458.51 to the Settlement Administrator [this may vary somewhat], divided by 2,734 claim forms [assuming all are counted] = $59.45.) Given the defendants' legal strategy—as the Court can see from a review of its docket, they opposed Plaintiff's efforts to obtain discovery every step of the way—the chances that a pro se class member, or even a non-specialist lawyer, would be able to obtain a comparable recovery are quite low.

In an environment in which the tabloids castigate class-action litigants for recovering pennies, assuming approval, no one can claim that a payment of $59.45 to each of 2,734 class members is anything less than rare and exceptional.

Accordingly, under Fed. R. Civ. P. 23, Plaintiff moves this Court for final approval of the proposed class-action settlement. As explained below, notice has

been provided to the Class Members in accordance with the Court's Preliminary Approval Order. Not surprisingly, none of the class members have objected and only five have opted out. This substantial recovery for the Class Members merits final approval of the settlement.

## Background and Summary of Settlement

Mr. Hallmark filed this case on October 6, 2011. In his complaint, Hallmark alleged that Defendant C&S sent him a letter (the "Letter") that violated the FDCPA, in that it incorrectly stated Hallmark's amount due on a debt owed to Midland. Plaintiff soon learned that the amount listed in the Letter was too high because it included a state-court filing fee before the filing fee had been incurred. Armed with this knowledge, on March 8, 2012, Plaintiff moved to amend the complaint to proceed with this case as a class action. On June 19, 2012, Plaintiff's motion was granted and on July 2, 2012, he filed a class complaint.

Hallmark moved to certify the class on December 3, 2012, while C&S moved for judgment on the pleadings on January 10, 2013 and Midland moved to dismiss on January 25, 2013. While the Court partially granted Defendants' motions, Hallmark's core FDCPA claim survived, and the Court granted Hallmark's motion for class certification. Extensive discovery, as well as discovery-related motion practice, followed.

On November 8, 2017, the parties engaged in an all-day mediation before Hugh Russ, Esq. as part of the Western District of New York's Settlement Week.

The parties agreed to the broad outlines of a class settlement on that date and have been hammering out the details since then. The result of these discussions was memorialized in a Class Action Settlement Agreement and Release (the "Agreement").

This Court granted preliminary approval to the class-action settlement. As set forth in the accompanying Declaration of Chris Amundson, the Parties gave notice in accordance with the Preliminary Approval Order.

## Argument

### I.    Class Notice and the Response of the Class

#### A.  Notice was reasonable and the best practicable

Due process, in the class action context, requires that the form of notice be reasonably certain to inform those affected. The Supreme Court has concluded that direct notice satisfies due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985). Here, the Parties agreed to a direct-mail notice program designed to reach all the Class Members. Defendants, through Analytics LLC – a class-action administration company – distributed direct-mail notice to the Class Members using the last known physical addresses of those Class Members as reflected in Defendants' business records. *See* Amundson Declaration. Thus, the Parties have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and benefits.

3

### B.  The response of the Class and how the parties propose to handle ambiguous claim forms

The Administrator received 2,695 timely claims and 39 late claims. *See* Amundson Declaration. Among these forms were 199 name-change forms with no supporting documentation as well as 40 unsigned claim forms. *Id.* The Administrator received five exemption-requests. *Id.* **No objections were received.**

With respect to the 39 late claim forms, the parties jointly request that the Court treat them as timely. With respect to the 199 claim forms with unsupported name-changes, the parties propose to send out settlement checks with the names that Defendants have. Presumably, any consumers with legitimate name-changes should still be able to deposit the funds using their prior names. If not, upon submission of proof of name change, the Administrator can issue a replacement check. With respect to the unsigned claim forms, Defendants request that a letter in a form to be approved by the Court be sent together with a new claim form and that each of the 40 consumers be given 30 days in which to return a signed claim form to the Administrator or lose their rights to a share of the Settlement Fund. The five consumers who requested exemption are to be exempted.

## II.  Factors Bearing on Final Approval

The Second Circuit has enumerated nine factors, known as the *Grinnell* factors, to guide courts in evaluating the fairness of a proposed settlement:

> (1) The complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing

4

liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (internal

citations omitted). The central question here is whether the compromise is

fair, reasonable, and adequate. *Id.*, citing *Weinberger v. Kendrick*, 698 F.2d

61, 73 (2d Cir. 1982).

### A.  The complexity, expense and likely duration of the litigation

This case is complex factually, raising significant legal questions regarding

whether the Defendants' conduct violated the FDCPA. Continued litigation would

be costly and if the case is not settled, it is likely that a final adjudication would not

take place for at least two more years. Importantly, the parties would have to bring

in experts to testify as to the net worth of Cohen & Slamowitz, LLP, which would

add a further layer of complexity to the case. Accordingly, this factor favors

approval of the settlement.

### B.  Reaction of the Class to the settlement

The reaction of the Class to the settlement has been overwhelmingly positive.

The claim-form response rate here of approximately 10% is virtually unheard of in a

case in which the alleged debts are so old that they are in the hands of a debt-buyer.

Moreover, this case has been pending for seven years, which makes the response

rate even more extraordinary. And there have been no objections and only five class

5

members have requested exclusion. *See* Amundson Declaration. No objections and only five exclusion requests tip "heavily in favor of a strong presumption of fairness." *See In re: Rite Aid Securities Litigation*, 269 F.Supp. 2d 602, 608 (E.D. Pa. 2003); *also see Aramburu v. Healthcare Financial Services, Inc.*, No. 02-CV-6535, 2009 WL 1086938, *4 (E.D.N.Y. April 12, 2009) (the fact that no class members opted out or objected weighs in favor of approval).

### C. The stage of the proceedings and the amount of discovery completed

The parties engaged in years of discovery and motion practice to prove up the case, eliminate affirmative defenses, determine the degree of control of Midland over C&S, determine class size and Defendants' net worth, and learn other key information needed to move for class certification and judgment or settlement. This included years of discovery and motion-practice, lengthy, multiple telephone conferences, email communications and a lengthy settlement conferences before Hugh Russ, Esq. with Mr. Hallmark present.

### D. The risk of establishing liability and damages

Although Plaintiff believes liability to be strong, Defendants deny liability. If tried, Plaintiffs would bear the burden of establishing that the notices violated the FDCPA. Defendants vigorously deny any wrongdoing, have asserted numerous defenses and maintain that the notices that are the subject of this case comply in all respects with the FDCPA. But the biggest risk here is not so much proving liability as it is procuring an award of damages in an amount that would be beneficial to the

6

class. That is, there is no minimum to class recoveries under the FDCPA – a jury could just as easily choose to award nothing as award 1% of Defendants' net worth. And even after years of litigation, C&S is continuing to maintain that its net worth is de mininis, while there is an issue as to how high Midland's maximum liability could be. Thus, the case cried out for compromise as to net worth. Essentially, in reaching the settlement agreed upon by the parties, Plaintiff and Defendants split the baby between C&S's claimed net worth and Plaintiff's best estimate of C&S's net worth.

### E. The risks of maintaining the class action through the trial

During litigation, the unexpected does happen and must be considered. Here, after years as one of the largest debt-collection law firms in New York, C&S has reinvented itself as Selip & Stylianou, LLP, run by the former managing attorneys of C&S, with Mr. Cohen and Mr. Slamowitz remaining involved in some capacity. This would add an entire additional layer to calculating Defendants' maximum liability. In short, the vagaries of litigation must be considered in evaluating a settlement's reasonableness and the case should settle now.

### F. The ability of Defendants to withstand a greater judgment

This is a significant factor in determining the fairness of the settlement. C&S has already reinvented itself and while Midland is one of the largest debt-buyers in the country, there is no guarantee that they could survive a recession. Throughout this litigation, Plaintiffs' attorneys have been well-aware that Defendants, whose

fortunes are based on what hard-pressed consumers can pay, could suffer a quick downturn and close for business. Plaintiffs' attorneys have seen some of the nation's largest debt-collection companies and law firms go into receivership. Although Defendants will not be bankrupted by this case, there is always some urgency nowadays when litigating against a debt-buyer.

### G. The range of reasonableness of the settlement in light of the best possible recovery in light of all the attendant risks; opinions of class counsel

This factor also weighs toward settlement. The 2,734 class members who sent in claim forms will be receiving checks for approximately $59.45 each. Any remaining funds will be distributed as *cy pres* to the Western New York Law Center.

This sum is considered unusually large for an FDCPA class action—especially for a Class with so many members. Even if Plaintiff were to win on liability and win at trial (and any appeal from final judgment), Plaintiff and the Class might still not recover more because of the 1% of net-worth cap under the FDCPA.

Defendants agreed to this settlement for economic reasons and to avoid the burdens of litigation without an admission of wrongdoing. Still, it resulted in an excellent recovery. In addition to the recovery for the class members, and the award to the class representative, counsel also negotiated for Defendants to pay class counsel fees and costs. For these reasons, the settlement is fair and reasonable, and Class Counsel have endorsed it.

8

### III.    Award to representative Plaintiff

Plaintiff requests, and Defendants have agreed not to object to, a personal award of $25,000 to Plaintiff Hallmark for the settlement of his individual claim and in recognition of his services as the Class Representative.  This award is warranted because of the Class Representative's involvement in this case and commitment to following up with counsel to assure that they were actively prosecuting this case.  In addition, Mr. Hallmark was actively involved not only in filing and litigating this case, but in spending time with counsel and with Mr. Russ negotiating the settlement. Most importantly, however, the award is, in part, to compensate Plaintiff for his individual claims against Defendants and for having waited seven years to be paid. In sum, Plaintiff has been a model class representative, and the proposed award is both reasonable and of the type commonly approved.

### IV.    *Cy Pres* Award

Any funds from settlement checks un-cashed (*i.e.*, checks not cashed within 90 days of the date on which they were mailed to Class Members) or other undistributed funds shall be awarded to the Western New York Law Center as the *cy pres* recipient, subject to the Court's approval.

### V.    The attorney fees and costs sought by Plaintiff on behalf of the class are fair and reasonable

Plaintiff, on behalf of the class, seeks a recovery of $400,000 for attorney fees and costs. This amount was agreed upon *after* the parties had agreed on the

settlement fund to the class (subject to reaching a final agreement). This sum for fees and costs does not impact the amount of money going to the class members in any way. Still, under *Amchem Products, Inc. v. Windsor*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Court must ensure that the payment is fair and reasonable.

Congress enacted the FDCPA more than three decades ago because of "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices" that harm the marketplace economy by "contribut[ing] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasion of individual privacy." 15 U.S.C. § 1692(a). Congress found that existing laws and procedures were "inadequate to protect consumers" and "means other than misrepresentation or other abusive debt collection techniques are available for the effective collection of debts." 15 U.S.C. § 1692(b) and (c).  Congress encouraged consumers to bring FDCPA actions before Federal Article III judges by eliminating any "amount in controversy" requirement. 15 U.S.C. § 1692k(d). Congress also fostered enforcement of the FDCPA by enacting statutory damages and mandating that debt collectors pay "reasonable attorney's fees as determined by the court." 15 U.S.C. § 1692k(a)(3).

Where a statutory attorney fees provision is phrased in mandatory terms, "fees may be denied a successful plaintiff only in the most unusual of circumstances." *De Jesus v. Banco Popular de Puerto Rico*, 918 F.2d 232, 234 (1st

Cir. 1990) (truth in lending). An award of fees is mandatory in FDCPA cases, *Zagorski v. Midwest Billing Services, Inc.*, 128 F.3d 1164 (7th Cir. 1997); *Tolentino v. Friedman*, 46 F.3d 645, 651 (7th Cir. 1995); *Graziano v. Harrison*, 950 F.2d 107, 113-14 (3d Cir. 1991) (FDCPA "mandates an award of attorney's fees as a means of fulfilling Congress's intent that the Act should be enforced by debtors acting as private attorneys general"), even if there has been no award of actual or statutory damages. *Emanuel v. American Credit Exchange*, 870 F.2d 805, 808 (2d Cir. 1989); *Pipiles v. Credit Bureau of Lockport*, 886 F.2d 22, 28 (2d Cir. 1989). Civil suits will deter abusive practices only if it is economically feasible for consumers to bring them. "Unless consumers can recover attorney's fees, it may not be possible for them to pursue small claims. . . . Unscrupulous collection agencies have little to fear from such suits if consumers must pay thousands of dollars in attorney fees to protect hundreds. Congress recognized this problem and specifically provided for the award of attorney fees to successful plaintiffs." *Venes v. Professional Service Bureau, Inc.*, 353 N.W.2d 671 (Minn. App. 1984).

## A.  The proposed fee is reasonable

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008), the Second Circuit clarified the proper analysis for a district court to undertake in exercising its considerable discretion in awarding attorney's fees. A court is to

> bear in mind *all* of the case-specific variables that we and
> other courts have identified as relevant to the

11

reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

*Id.* at 190.

As shown below, the *Johnson* factors, drawn from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974), *overruled on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989), support the reasonableness of the negotiated fee. The *Johnson* factors are:

(1)   the time and labor required;
(2)   the novelty and difficulty of the questions;
(3)   the skill requisite to perform the legal services properly;
(4)   the preclusion of other employment by the attorney due to acceptance of the case;
(5)   the customary fee in the community;
(6)   whether the fee is fixed or contingent;
(7)   time limitations imposed by the client or the circumstances;
(8)   the amount of time involved and the results obtained;
(9)   the experience, reputation, and ability of the attorneys;
(10)  the "undesirability" of the case;

12

> (11)    the nature and length of the professional
>          relationship with the client; and
> (12)    awards in similar cases.

*Id.* at 717-19.

There is no strict formula as to how these factors are to be applied. *Trimpter v. City of Norfolk*, 846 F. Supp. 1295, 1303 (E.D. Va. 1994). Once a figure for attorney's fees is calculated using the *Johnson* factors, that amount becomes the "lodestar" which can then be adjusted upwards or downwards, again using the *Johnson* factors. *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). "[M]any of those factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434 n.9. If the lodestar figure is properly calculated, adjustment will be unnecessary in most cases. *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986). There is a strong presumption that the lodestar figure (reasonable hours multiplied by a reasonable rate) represents a reasonable fee. *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989), quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 656 (1986). Currently prevailing marketplace rates establish the lodestar amount. *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989); *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *DiFilippo v. Morizio*, 759 F.2d 231, 235 (2d Cir. 1985) (rejecting 46 hours on pretrial memo and 42 hours on fee application); *Cohen v. West Haven Bd. Of Police Com'rs*, 638 F.2d 496, 506 (2d Cir. 1980). "The district court may not reduce the established market rate by some factor that it believes accounts for differences between large

13

firms and small firms. Lawyers of common expertise and experience in the same market are entitled to the same rate. *Bankston v. State of Illinois*, 60 F.3d 1249, 1255-56 (7th Cir. 1995); *Bailey v. District of Columbia*, 839 F. Supp. 888, 891 (D.D.C. 1993) (no distinction between solo and large firm rate); *Gary v. Kason Credit Corp.*, No. 95-CV-54 (D. Conn. Oct. 21, 1998) (rejecting "overhead" argument).

District courts should not treat an attorney's status as a solo practitioner as grounds for an automatic reduction in the reasonable hourly rate. Cases suggest that in determining the relevant "market," a court may look to rates charged by those similarly situated, including looking to the rates charged by large- or medium-sized law firms, based on the widely-held premise that a client represented by a medium-sized firm pays less than a client represented by a large firm with higher overhead costs. *See e.g., Chambless v. Masters Mate & Masters Pension Plan*, 885 F.2d 1053, 1058-59 (2d Cir. 1989); *Algie v. RCA Global Commc'ns, Inc.*, 891 F. Supp. 875, 895 (S.D.N.Y. 1994). But whether or not the aforementioned premise – that the bigger the firm the higher the attorneys' hourly rates charged – is correct, and even assuming it may be that solo practitioners of equal skill, expertise and reputation, charge less than those at large- or medium-sized firms, courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner. Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate. *Miele v. New York State*

*Teamsters Conference Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir. 1987); *Blum*, 465 U.S. at 895-96 (rejecting the Solicitor General's suggestion that fees awarded to non-profit legal aid societies be based on a "cost-related standard"). Rather, overhead merely helps account for why some attorneys charge more for their services. Indeed, it may be that in certain niche practice areas, attorneys of the highest "skill, expertise and reputation" have decided to maintain a solo practice instead of affiliating themselves with a firm. The reasons for doing so may be numerous, including the inherent problems of higher overhead, fee-sharing, and imputed conflicts of interest. The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation." *Blum*, 465 U.S. at 295 n.11; *Chambless*, 885 F.2d at 1058-59. Working as a solo practitioner may be relevant to defining the market, *See Chambless*, 885 F.2d at 1059 ("smaller firms may be subject to their own prevailing market rate."), but it would be error to use an attorney's status as a solo practitioner as an automatic deduction or shortcut for determining the reasonable hourly rate. *McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 n.6 (2d Cir. 2006) (emphasis added).

While the Court has discretion to determine the proper fee, "the latitude of its discretion is narrowed by a presumption that successful [litigants] should recover reasonable attorney's fees unless special circumstances render such an award

unjust. . . . Furthermore, where, as here, the party achieves success on the merits, an award of all reasonable hours at a reasonable hourly rate, *i.e.*, the lodestar figure, is presumptively appropriate." *DiFilippo*, 759 F.2d at 234 (discussing civil rights litigants). "[A] party advocating the reduction of the lodestar amount bears the burden of establishing that a reduction is justified." *United States Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir. 1989) (awarding $5,500,000 in fees on $3 recovery), cited in *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir. 1992); *see* Laura B. Bartell, *Taxation of Costs and Awards of Expenses in Federal Court*, 101 F.R.D. 553, 560-62 (1984).

### B.  Plaintiff's attorneys' hourly rates are reasonable

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, the Second Circuit held that a reasonable hourly rate is the rate a "paying client would be willing to pay," bearing in mind that a "reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190.  Determination of the reasonable hourly rate "contemplates a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicants counsel [, which] may ... include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *See Farbotko v. Clinton County of New York*, 433 F.3d 204, 209 (2d Cir. 2005) (citations omitted). The hourly rates, however, "should be 'current rather than historic.'" *Underdog Trucking, L.L.C. v. Verizon Serv. Corp.*, 276 F.R.D. 105,

16

108 (S.D.N.Y.2011) (quoting *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006), cert. denied, 549 U.S. 1211 (2007)) (inner citation and quotation marks omitted). The Second Circuit has stated that, in determining what rate a paying client would be willing to pay, the district court should assess case-specific considerations, including the factors enumerated in *Johnson*. *See Johnson*, 488 F.2d at 717–19. *See also Arbor Hill*, 522 F.3d at 186–90.

The requested rates of Class Counsel here – $375 an hour for Mr. Bromberg (a solo practitioner in New York City), $350 an hour for Mr. Hiller (the principal of a law firm headquartered in Buffalo), $300 an hour for Mr. Miller (a solo practitioner in Winston-Salem, NC), $300 an hour for Michael N. Litrownik (for the work performed while employed as an associate at Mr. Bromberg's office), and $300 an hour for Seth Andrews (an associate at Mr. Hiller's firm) – represent the prevailing rates for attorneys prosecuting complex consumer fraud class actions in their respective markets. Just last month, in a detailed decision, these rates were held reasonable for FDCPA cases in this District for Mr. Bromberg, Mr. Hiller, and Mr. Miller. *See Godson v. Eltman, Eltman & Cooper, P.C.*, No. 11-CV-764-EAW, ___ F.R.D. ___, 2018 WL 5263071 (W.D.N.Y. Oct. 23, 2018). Mr. Andrews and Mr. Litrownik were awarded lower rates because they did not submit declarations of their own, but that has been remedied here so the rates for their work on this case should be $300 an hour each. *See* accompanying Declaration of Mr. Andrews and Mr. Litrownik.

17

### C. An upward adjustment should be made

The burden of proof is on the opponent to present specific evidence that a lower amount is appropriate. *See, e.g., United States Football League*, 887 F.2d at 413; *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992) (fee opponent must submit evidence); *Brinker v. Giuffrida*, 798 F.2d 661, 668 (3d Cir. 1986) ("[T]here is ordinarily no reason for a court to disregard uncontested affidavits of a fee applicant"). Here, Plaintiffs' lodestar totals $396,672.50 and Plaintiff's costs total $22,187.41. This case settled due to Plaintiffs' counsel's knowledge and expertise in the field of consumer-protection law. Apart from the Bromberg Law Office, P.C., no law firms are regularly prosecuting FDCPA cases to class certification in the federal or state courts in New York. In other words, it is rare indeed for FDCPA cases to proceed to class certification – whether on merits certification or as part of certification on settlement – in New York. Large firms will not take class cases under the FDCPA because of the cap on statutory damages, and small firms rarely prosecute such cases effectively. Here, Plaintiff would ordinarily request a modest multiplier for achieving extraordinary results, but this is not necessary because fees and costs already exceed $400,000 without a multiplier. *Vizcaino v. Microsoft*, 290 F.3d 1043 (9th Cir. 2002) (surveying many decisions awarding multipliers and concluding that multipliers between 1 and 4 are the norm in common fund cases); *In re Cendent Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) ("multiples ranging from one to four are frequently awarded in common

18

fund cases when the lodestar method is applied."); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving multiplier of about 8.3 times lodestar, where attorney fees represented 20% of the common fund); *In re Beverly Hills Fire Litig.*, 639 F.Supp. 915 (E.D.Ky, 1986) (five); *In re Cenco Inc. Sec. Litig.*, 519 F.Supp. 322 (N.D.Ill. 1981) (multiplier of four to lead firm). Moreover, under the adjustment factors identified in *Johnson*, the fees and costs agreed upon by the parties are fair and reasonable. *Johnson*, 488 F.2d at 717-719.

It is common for judges within the Western District of New York to apply such multipliers. *See, e.g.*, *Godson*, 2018 WL 5263071, at *18 (Wolford, J.) (endorsing lodestar multiplier of 1.58 in an FDCPA class action); *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 232-33 (W.D.N.Y. 2017) (Feldman, M.J.) (applying 2.84 multiplier); *In re Eastman Kodak ERISA Litig.*, 213 F. Supp. 3d 503, 509 (W.D.N.Y. 2016) (Larimer, J.) (approving lodestar multiplier of 3.25); *Acevedo v. Workfit Medical LLC*, 187 F. Supp. 3d 370 (W.D.N.Y. 2016) (Wolford, J.) (endorsing lodestar multiplier of 1.3); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. Oct. 11, 2011) (Larimer, J.) (lodestar multiplier of 5.3 in FSLA class action); *Odom v. Hazen Transport, Inc.*, 275 F.R.D. 400, 413 (W.D.N.Y: 2011) (Payson, J.) (lodestar multiplier of 1.04).

### 1. The time and labor required.

Even with experienced class counsel on both sides, this case took years to

settle. Plaintiffs submit that the time expended prosecuting this action would have been considerably greater had different counsel represented the Class. That is, Class Counsel's experience in consumer-protection litigation undoubtedly resulted in an early grant of class-certification and in obtaining the discovery necessary to show that Defendants had violated the FDCPA by seeking to collect filing fees pre-filing and in obtaining tens of thousands of pages of documents to prove up C&S's net worth — all of which were key pressure points that induced Defendants to settle. *See Withers v. Eveland*, 997 F. Supp. 738, 740 (E.D.Va. 1998) (finding that "there are very few attorneys who specialize in litigating Consumer Credit Protection Act cases"). This lawsuit spanned seven years and resulted in **381** docket entries at the district level as well as an attempt by Defendants to obtain leave for an interlocutory appeal under Fed.R.Civ.P. 23(f) from the Second Circuit. In other words, Defendants resisted every step off the way, and nothing was easy for Plaintiffs' attorneys. In truth, Plaintiffs' attorneys could have mounted a plausible argument that they were entitled to much more than $400,000 for seven years' worth of litigation and expenses; however, Plaintiffs' attorneys agreed to cap their fees and costs to facilitate settlement and guarantee a meaningful recovery for the class members.

Even a cursory review of the hundreds of cases filed under the Consumer Credit Protection Act – *i.e.*, under TILA, the FDCPA, the FCRA, ECOA, etc. – every year in the U.S. District Courts in New York will show that in many of the

instances where class certification was sought and achieved, Plaintiff's counsel was retained as lead counsel. This is the very definition of a rare and extraordinary circumstance for which the Courts contemplate modest multipliers.

Plaintiff's attorneys have small firms – for the Bromberg Law Office, one attorney (plus a second attorney during much of the litigation); for the Law Office of Kenneth Hiller, PLLC, two attorneys who handle FDCPA cases; and for the Salem Community Law Office, one attorney – and, as such, they do the bulk of the work on their own. As one district court has noted:

> . . . attorneys, like plaintiff's counsel, operating either as solo practitioners or in small firms, often lack the resources to retain a large staff of junior lawyers who could handle (certain more clerically related) tasks more economically. Denying plaintiffs compensation for these tasks would unfairly punish plaintiffs and their counsel for not staffing this case as if they had the manpower of a major law firm.

*Bailey*, 839 F. Supp. at 891; *see also*, *Withers v. Eveland*, 997 F. Supp. at 740, and *Morgan v. Credit Adjustment Board*, 1998 U.S. Dist. Lexis 8135 at 5. Therefore, the time spent by Plaintiff's counsel to complete this litigation, as set forth in the attachments hereto, warrants upward adjustment of the lodestar.

## 2. The novelty and difficulty of the questions.

Because the questions presented by this case were novel, only seasoned FDCPA litigators would have noticed them. Plaintiffs' attorneys know of no one who has litigated many of the various FDCPA issues here. In fact, it was only years of motion practice and paper discovery, and consultations with an accountant that the

parties were able to work out a settlement on a class-wide basis. And negotiating settlement of the various class issues requires a degree of specialized legal acumen regarding the FDCPA. Both Mr. Bromberg and Mr. Miller have had the unfortunate duty of occasionally having to step forward to try to stop FDCPA and other class settlements that would have sold consumers short, so they are keenly aware of the issues that had to be given close review in the settlement agreement. Thus, the novelty and difficulty of litigating any class action and especially one in such a specialized field warrants upward adjustment of the lodestar.

### 3. The skill requisite to perform the legal services properly.

Successful litigation of FDCPA class actions requires skill and familiarity with the issues involved. Plaintiff's counsel knows of very few attorneys who purport to be able to litigate plaintiffs' credit-consumer-protection cases. Most attorneys do not recognize the legal issues involved in such cases, and requests for representation are generally turned away by members of the Bar. In the Western District of New York, few if any class actions are filed under the FDPCA and even fewer are settled on a class-wide basis. Because of the skill of Plaintiff's counsel and the rarity of successfully prosecuting FDPCA class actions in this district, Plaintiff requests an upward adjustment of the lodestar.

### 4. The preclusion of other employment.

The time spent on this case was not, and could not be, spent at the same time on other cases. There are substantial opportunity costs in preparing the necessary

documentation and briefing to represent plaintiffs in a contingency or fee-shifting case in federal court. The substantial amount of time expended on Plaintiff's behalf was time which would have been spent on other matters, had this case not been filed or litigated to this extent.

Therefore, it is appropriate to consider that whenever an attorney takes a case, he does so to the exclusion of accepting other work. Plaintiff's counsel spent seven years reviewing this case and litigating it to its conclusion, to the exclusion of helping other consumers. Thus, some consumers did not receive counsel's help so that Mr. Hallmark and the Class could. Because the more than seven years spent on this case would have been expended on other matters, this factor provides a basis for an upward adjustment of the lodestar.

### 5. The customary fee for like work in the community.

Plaintiffs' fee request is well within the range of similar work and is an amount recognized by other courts. The fee is thus reasonable and represents the going rate for like work in this area. But the involvement of Plaintiff's counsel in this case undoubtedly is the primary factor that led to settlement on a class basis. Moreover, because there is simply no relevant community of consumer class-action litigators in this district, the relevant question becomes one of the rates that Mr. Bromberg and Mr. Miller could command in their home districts. As set forth in the accompanying declarations and in this Court's recent decision in *Godson*, the rates requested are reasonable. But the nature of this case and the results obtained

justify an upward adjustment of the lodestar. This *Johnson* factor is addressed in greater detail below.

### 6. Whether the fee is fixed or contingent.

An award of attorney fees in a contingency fee matter should compensate counsel for the risk of receiving no compensation. In consumer-protection cases, the fee is very often contingent – not on the amount of damages, but on an award by the court or agreement by the opponent. In a private attorney general case, Congress encourages counsel to sue, recognizing that counsel cannot charge the client an hourly fee, because the fee may be out of proportion to the recovery. If contingent, the fee award should compensate counsel for the risk of receiving no compensation. "Lawyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, win or lose." *Blum*, 465 U.S. at 903. For example, Plaintiffs' attorney was also involved in the FDCPA case entitled *Lemire v. Wolpoff & Abramson, P.C.*, D. Conn., Docket No. 08-cv-249(CSH). There the plaintiffs settled the case after prevailing on a disputed motion to certify the class. The settlement provided for a negotiated attorney fee. Notwithstanding the successful work performed in that case, the defendant dissolved, making collection of the settlement amount impracticable, and necessitating decertification.

Plaintiff's counsel was willing to provide services to Mr. Hallmark whether he won or lost his case and whether or not counsel would receive compensation for that

work. This factor justifies an upward adjustment of the lodestar.

### 7. Time limitations imposed by the client or the circumstances.

The time limits in this case were only those imposed by the applicable statutes of limitations, the Rules, and those set by the Court. Therefore, this factor is of no consequence.

### 8. The amount involved and the results obtained.

The results obtained for the Plaintiff were significant, and they reflect counsel's substantial efforts in preparing and litigating this matter. Plaintiff has obtained a monetary recovery that is on the high end for FDCPA class cases. By any calculation, this is an extraordinary result, warranting an upward adjustment of the lodestar.

### 9. The experience, reputation and ability of the attorney.

Plaintiff's attorney, Brian L. Bromberg, has been practicing since 1992, is admitted in New York, New Jersey, and California, and has established a reputation as a consumer-protection attorney. *See* accompanying declaration of Brian L. Bromberg. Although his former associate, Michael N. Litrownik, and his current associate, Jonathan R. Miller, have been admitted for fewer years, they are admitted to state bars and have extensive experience in the state and federal courts. In fact, before he left Mr. Bromberg's firm, Mr. Litrownik tried two cases with Mr. Bromberg – one an FLSA collective arbitration and the other a § 1983 trial before a jury in the Eastern District of New York. As for Mr. Miller, he attended

25

Harvard Law School, clerked for a judge of the Supreme Court of Missouri, and is admitted in New York, Missouri, and North Carolina. *See* accompanying Miller and Litrownik Declarations. Plaintiff's Buffalo attorneys, Kenneth Hiller and Seth Andrews, have been practicing since 1984 and 2005, respectively. They are the leading consumer-protection lawyers in this District. *See* accompanying declarations of Kenneth Hiller and Seth Andrews. These factors warrant an upward adjustment of the lodestar.

### 10. The undesirability of the case.

There are few attorneys who have the knowledge, ability and willingness to represent consumers in this area of law. Most attorneys are unwilling to take the risk of large investments of time for what appear at first blush to be minor, small dollar cases. No other attorneys in this Circuit regularly prosecute Consumer Credit Protection Act cases to conclusion as class actions. Searches on Westlaw and PACER will reveal that many of the successful certifications of a class under the FDCPA in the Southern and Eastern Districts of New York over the past 15 years have involved at least one of Mr. Bromberg as class counsel.) Practically no FDCPA class actions are certified in the Western District of New York and the only ones Class Counsel knows of, *Easterling v. Collecto, Inc.* and *Godson v. Eltman, Eltman & Cooper, P.C.*, were filed and prosecuted – at both the district-court and circuit levels – by Mr. Bromberg, Mr. Hiller, Mr. Andrews, Mr. Miller, and Mr. Litrownik. Many other attorneys will file such cases as class actions, but few push them to

certification. (Plaintiff's attorneys are also willing to push cases beyond the district-court level, frequently taking cases up on appeal.) Accordingly, this factor, too, warrants an upward modification of the lodestar.

### 11. The nature and length of the professional relationship with the client.

Mr. Hallmark retained his attorneys specifically to pursue the specialized consumer-protection laws at issue. Their employment was sought because of their legal abilities and reputations in this area of the law. Such representation is limited to consumer-protection claims, which are episodic rather than ongoing. Unlike their big-firm brethren, consumer attorneys cannot rely on hefty retainers from paying institutional clients or insurance companies over many years. Therefore, this *Johnson* factor warrants an upward modification.

### 12. Awards in similar cases.

The only reported case in New York discussing attorney fee awards in successful FDCPA class actions that took seven years to litigate is the decision in *Godson*. This Court in *Godson* awarded $350,000. A comparison of the billing records and docket here with the same in *Godson* shows that this case took more work and more expense to litigate. Courts recognize that fee awards are to mimic the marketplace. Thus, "[p]aying counsel in FDCPA cases at rates lower than those they can obtain in the marketplace is inconsistent with the congressional desire to enforce the FDCPA through private actions, and therefore misapplies the law." *Tolentino*, 46 F.3d at 653; *Zagorski*, 128 F.3d 1164. Because this case is unusual,

27

having taken more than seven years to litigate – and *prevail* – an upward modification of the lodestar is warranted.

### D. Award to representative Plaintiffs

Plaintiff requested, and Defendants have agreed to, a $25,000 award to Mr. Hallmark. Plaintiff took time to meet with class counsel, assisted with the case, and kept apprised of case status and developments. More importantly, he appeared for a lengthy in-person settlement conference before Mr. Russ and he was instrumental in making sure that his attorneys worked for the good of the Class. Such awards are both reasonable and of the type commonly approved. *See, e.g., In re: Marine Midland Motor Vehicle Leasing Litigation*, 155 F.R.D. 416 (W.D.N.Y. 1994). Moreover, the award represents roughly 11% of the total class award.

### VI. Plaintiff is entitled to recover the costs of having to retain an expert consulting accountant to sift through the tens of thousands of pages of financial records C&S eventually produced

Defendants may claim that Plaintiff is not entitled to recover for the $15,925 due to the expert consulting accountant he was forced to hire. First, the Court may choose not to reach this issue because the case warrants an award of attorney fees and costs in excess of the cap of $400,000 agreed upon by the parties. Nevertheless, should the Court reach the issue, the law is clear that awards of fees and costs under § 1692k of the FDCPA are governed not by the more crabbed statutory cost recoveries available to all litigants under the "American Rule," but under the broader awards available under federal fee-shifting statutes. Therefore, the case law for civil rights cases is the same as for FDPCA cases. Here is what the Second Circuit has had to say in the context of civil-rights

cases, which makes it clear that any costs that would ordinarily be borne by a private litigant—like

the cost of hiring expert-witnesses—are recoverable by the prevailing party:

> "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *United States Football League v. National Football League*, 887 F.2d 408, 416 (2d Cir. 1989 (citing *Reichman v. Bonsignore, Brigati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987)), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). In this case, the district judge denied the expenses claimed by plaintiffs, including expenses for "duplicating, postage, telephone, computerized legal research and other office expenses," on the ground that "*[m]ost* of these would *appear to be* attorney's ordinary overhead and ... would not be normally charged to fee paying clients." Fee Decision at 10–11 (emphasis added). Many of the categories referred to, however, are not properly treated as overhead expenses for purposes of a fee award but are the sort of expenses that may ordinarily be recovered. *See, e.g., Kuzman v. Internal Revenue Service, 821 F.2d 930, 933-34 (2d Cir. 1987)* ("Identifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under § 1988 and are often distinguished from nonrecoverable routine office overhead, which must normally be absorbed within the attorney's hourly rate."); *Aston v. Secretary of Health and Human Services*, 808 F.2d 9, 12 (2d Cir. 1986) (postage, photocopying, travel, and telephone costs reimbursable under Equal Access to Justice Act, 28 U.S.C. § 2412); *Abrams v. Lightolier*, 50 F.3d 1204, 1225 (3d Cir. 1995) (reproduction and postage expenses may be recovered under § 1988); *see also United States ex rel. Evergreen Pipeline Construction Co. v. Merritt Meridian Construction Corp., 95 F.3d 153, 173 (2d Cir. 1996)*; (computerized research expenses recoverable as part of attorneys' fees, rather than as costs). On remand, the district court should reconsider plaintiffs' claim for expenses and articulate which expenses, if any, it deems not reimbursable.

*LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998).

## Conclusion

The Parties have reached a Settlement in this case that provides a genuine benefit to the Class Members. After more than seven years of litigation that required the active and regular involvement of Mr. Bromberg, Mr. Miller (and his predecessor at the Bromberg Law Office, P.C., Mr. Litrownik), Mr. Hiller, and Mr. Andrews, the Parties achieved an excellent settlement. The Settlement is an excellent result considering the size of the class and the cap on total possible recovery. Each Class Member who sent in a claim form will receive a substantial recovery of approximately $59.45. In addition, the terms of the Settlement as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigating this case through trial and appeal satisfy the Second Circuit's strictures for final approval. Accordingly, Plaintiff asks the Court for an Order approving the Settlement and Class Counsel's request for attorney fees and costs.

Dated: November 21, 2018

PLAINTIFF, MICHAEL HALLMARK,
Individually, And On Behalf Of the Class,

By: /s/ Brian L. Bromberg
     Brian L. Bromberg